UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                          :
                                                  :
            - v -                                 :        **23-Cr-509 (JHR)**
                                                  :
JOSE GUERRERO BAEZ**,**                           :
                                                  :
                    Defendant.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## <u>DEFENSE SENTENCING SUBMISSION</u>


                                  MICHAEL ARTHUS
                                  Federal Defenders of New York, Inc.
                                  52 Duane Street, 10th Floor
                                  New York, New York 10007
                                  212-417-8760



TO:        DAMIAN WILLIAMS
           United States Attorney
           Southern District of New York
           26 Federal Plaza
           New York, New York 10278
           Attn: AUSA Brandon Thompson

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

I.    INTRODUCTION .......................................................................................................1

II.   FACTUAL BACKGROUND ......................................................................................2

    A.   Mr. Peralta's challenging upbringing, lack of education, and severe poverty. ...............2

    B.   The instant offense, involving an unsophisticated, bungled deal with a CI...................5

    C.   Mr. Peralta's horrific experience while at the MDC, and his sincere remorse...............6

    D.   The Probation Department recommends a substantial downward variance. ................8

III.  THE APPROPRIATE SENTENCE IS SIXTY MONTHS' IMPRISONMENT .........8

    A.   The drug guidelines – which judges have repeatedly criticized as illogical, politically driven, and not based on empirical evidence, and which judges on the Sentencing Commission have rejected on policy grounds – do not deserve any deference.......................9

    B.   The § 3553(a) factors support a 60-month sentence.............................................14

    C.   A sentence greater than sixty months would result in unwarranted sentencing disparities with similarly situated defendants.........................................................23

IV.   CONCLUSION .........................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................................9

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................................10

*Pepper v. United States*, 562 U.S. 476 (2011)..................................................................8

*United States v. Bean*, 317 F.Supp.3d 46 (D.N.H. 2019) ...............................................18

*United States v. Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008) ....................................12

*United States v. Chavez*, 22-Cr-303, ECF No. 31 (S.D.N.Y. Jan. 4, 2024).....................19

*United States v. Colucci*, 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024)...........................20

*United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. 2013)........................................passim

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)................................................ 8, 9

*United States v. Goodman*, 556 F.Supp.2d 1002 (D. Neb. 2008)...............................2, 12

*United States v. Hayes*, 948 F.Supp.2d 1009 (N.D. Iowa 2013) .........................12, 13, 18

*United States v. Hubel*, 625 F.Supp.2d 845 (D. Neb. 2008) ..........................................12

*United States v. Robinson*, 2022 WL 17904534 (S.D. Miss. 2022) ......................10, 13, 14

**Statutes**

18 U.S.C. § 3553..........................................................................................................passim

Anti-Drug Abuse Act of 1986 .........................................................................................10

**Other Authorities**

Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021) ......................22

Courtney Gross, *Inmates Decry Conditions in Brooklyn Jail*, NY1 (June 24, 2024) ......20

Emily Widra, *The Aging Prison Population: Causes, Costs, and Consequences*, Prison Policy Initiative (Aug. 2, 2023)...................................................................................................................21

Linda Whiteford and Kenneth Goodman, *Culture Summary: Dominicans*, HRAF (2003) .........................2

Nat'l Inst. On Drug Abuse, *Drug Overdose Deaths: Facts and Figures* (Aug. 2024)....................................18

National Assoc. of Criminal Defense Lawyers, Comments on the 1997 Amendments – Part II (Mar. 28, 1997) ...........................................................................................................................11

U.S. Department of Justice, *Five Things About Deterrence*, National Institute of Justice (May 2016)......22

U.S. Sent'g Comm'n, *Methamphetamine Final Report* (Nov. 1999) ...............................11

U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* (June 2024)...................................................................................................................... 14, 18

U.S. Sent'g Comm'n, *Methamphetamine: Final Report of the Working Group* (1999) ..........................11

U.S. Sent'g Comm'n, *Recidivism of Federal Drug Trafficking Offenders Released in 2010* (Jan. 2022) .... 21, 23

U.S. Sent'g Comm'n, *Report to Congress: Mandatory Minimum Penalties in the Criminal Justice System* (2011) ...........................................................................................................................12

U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2023, Southern District of New York* .........24

U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017)...................21

**Regulations**

U.S.S.G. § 2D1.1 ...................................................................................................... 9, 14

U.S.S.G. § 5H1.1 ............................................................................................................21

U.S.S.G. App. C, Amend. 555 (Nov. 1, 1997) ................................................................11

## I.    __INTRODUCTION__

In late 2023, Santo Peralta Lara[1] – a 52-year-old grandfather who had grown up as a child laborer in terrible poverty, never had the benefit of formal schooling, and was illiterate – found himself in dire financial straits.  He was responsible for supporting his large family, including his mother who was gravely ill.  Struggling to find decent-paying work, Mr. Peralta agreed to participate in a drug sale to a confidential informant.  The deal was bumbling and inept: he and his co-defendant showed up with no drugs, hoping the CI would pay them anyway; when that plan failed, drove aimlessly around Manhattan for nearly two hours in search of whatever product they could find; and ultimately obtained methamphetamine pills that were only about 3% pure.  When he was arrested, Mr. Peralta immediately and tearfully admitted what he had done.

For the last fourteen months, Mr. Peralta has been confined in pre-trial detention at the MDC, one of America's most notorious jails.  He has witnessed unrelenting violence, suffered inhumane deprivation, and endured agonizing pain from untreated medical conditions.  He has been isolated from his family and unable to access any programming.  And even when his sentence eventually ends, he will still need to spend months more in immigration custody.  As someone who has never spent more than a few months in jail, the experience has been a much-needed wakeup call.

Mr. Peralta has learned a hard lesson.  He knows he will be punished for what he did.  For an aging grandfather who overcame a very difficult background, committed this crime out of financial desperation, was not a major drug trafficker, and maintains the unwavering love and support of his family, a sixty-month sentence would be sufficient and not greater than necessary.

---

[1] Although the indictment lists his name as "Jose Guerrero Baez," Mr. Peralta's birth name will be used throughout this submission.

## II.    FACTUAL BACKGROUND

### A.    Mr. Peralta's challenging upbringing, lack of education, and severe poverty.

Now 52 years old, Santo Peralta Lara grew up in a deeply impoverished village in the Dominican countryside.  Santo's father was never present, and his mother, Isabel, raised him and his siblings in a tiny, hand-constructed hovel made of palm wood.  Isabel worked six days a week in the sugar cane fields, leaving the children to fend for themselves.  Young Santo's home had no electricity, plumbing, or running water, and he lugged gallons of water from a communal well to drink and bathe.

The 1970s were a time of severe turmoil in the Dominican Republic.  The unemployment rate was between 30-40%, and "illiteracy, malnutrition, and infant mortality rates were dangerously high." *See* Linda Whiteford and Kenneth Goodman, *Culture Summary: Dominicans*, HRAF (2003), https://ehrafworldcultures.yale.edu/cultures/st04/summary.  The government became destabilized following a collapse in global oil prices, and both gang and state-sponsored violence became a part of daily life.  *Id.*  Santo experienced this through the eyes of a child: he often starved, narrowly evaded being beaten and robbed on the streets, and spent every day in a state of fear.

Santo did not have a chance to go to school, and he never learned to read or write.  Instead, when Santo was seven years old, Isabel told him he needed to go to work in the fields.  Each day, Santo walked several miles to do backbreaking labor chopping sugar cane and picking coffee beans and tomatoes.  He worked nine-hour days in sweltering heat, under the command of violent and abusive foremen.  Older workers ran the field like a gang and took advantage of child laborers like Santo: they beat him, whipped him with belts, slashed him with machetes, forced him to do the heaviest labor, and prevented him from drawing any water from the nearby well.  His hands are still covered in the calluses he developed, and his body still bears scars.  He was paid less than $1 per day.

2

Mr. Peralta endured those conditions for sixteen years, and all his earnings went to provide for his family. As he got older, that family grew. Mr. Peralta became a father of five, and he loved his children dearly, providing as much as he could for their wellbeing. His youngest son recalls:

> He always helped me whenever I needed it and made sure to instill the importance of working in me from a young age. By the time I was a teenager he taught me how to do different jobs and was very honest about how things are: how the world works, and how we need to work hard for the things we want in life. He set the example for my brothers and I, and always balanced the hard work with fun moments – he never missed a celebration or birthday and made sure to celebrate everyone.

Ex. D (Letter from Jose Manuel Peralta). Mr. Peralta tried to find better paying work in the construction field, but he made far too little to support his mother, siblings, and children.

When he was 36, Mr. Peralta came to the United States. He hoped to find better work, but as someone without legal status he struggled to do so, and he was deported after less than a year following a state drug arrest for which he was never convicted. Returning a short time later, he spent five years in this country as a hard-working manual laborer. Like many immigrants, he was often exploited in his construction jobs: his employers knew they could pay him below the minimum wage, deprive him of paychecks, and force him to work extraordinary hours due to his lack of status. Mr. Peralta earned barely enough to keep himself afloat, let alone provide for his desperate family in the Dominican Republic, and he unfortunately started selling drugs. In 2018, Mr. Peralta was convicted of a drug charge in Rhode Island – his first ever criminal conviction. He served nine months in jail, after which he was brought to federal court, convicted of illegal reentry, sentenced to time served, and deported.

Mr. Peralta moved back in with his mother and siblings in the Dominican Republic, still in their tiny hovel in the countryside. Isabel was now nearly ninety years old, and her health was declining rapidly. For five years, Mr. Peralta worked a series of low-paying jobs to cover Isabel's medical expenses. He worked as a construction worker, taxi driver, but ticket-taker – anything that he could do to help pay the bills as someone who still could not read. When his sister became ill and nearly

lost her leg, Mr. Peralta used all his meager savings to pay for her treatment, and she writes, "I still have my leg because of him." Ex. D (Letter from Melva Peralta Lara). Yet despite his financial difficulties and the struggle his life had become, Mr. Peralta never lost his optimism, and his family recalls that he always "put a smile on everyone's face":

> No matter how hard it got, he would always find a job and made sure we ate every day. He would work all day to be able to eat at night . . . His endurance and perseverance through a lifetime of financial struggles has been one of his biggest accomplishments.

Ex. D (Letters from Jose Manuel Peralta and Melva Peralta Lara). His family continued to grow and he became a grandfather.

Mr. Peralta, crushed by the responsibility of providing for his family and covering his mother's medical bills, ultimately made the difficult decision to return to the United States. It was the wrong choice, since he did not have legal status. And his journey was both arduous and expensive. A coyote charged Mr. Peralta thousands of dollars to get him across the border, a perilous and life-threatening trip. In retrospect, returning to the United States only made things worse, since he was deeply indebted to some very dangerous people.

Mr. Peralta returned to construction work and tried his best to make a living, sending all his earnings back home. He also reconnected with his former partner, Silvia Encarnacion, and they began a relationship again. As Silvia describes:

> He has always been a good person to me, someone with strong values and many good qualities as a human being. Some of my favorite things are his smile and his help. He would help a lot at home, wake me up with a cup of coffee in bed, and carry everything for me. He made sure I felt his care and his loving nature was always present in our relationship.

Ex. D (Letter from Silvia Encarnacion). Silvia recognized, however, that Mr. Peralta was barely getting by, and often had to send him food and clothes. Mr. Peralta could not afford his rent and nearly

became homeless. One of his sons – the only other family member he had in the US – needed to take him in, and they lived in a tiny Boston apartment with eight strangers. The experience was humiliating.

**B.** **The instant offense, involving an unsophisticated, bungled deal with a CI.**

Mr. Peralta had hoped to live a law-abiding life in the United States, but as a poor immigrant, heavily in debt and lacking any education, he was an easy target for exploitation. In 2023, Mr. Peralta communicated with a drug dealer known as "Flaco." Hoping to make himself seem valuable, Mr. Peralta claimed to have access to a supplier who could provide drugs for resale. Flaco saw an opportunity, and put Mr. Peralta in touch with someone who was looking to buy. What Flaco and the buyer did not know was that Mr. Peralta was wildly exaggerating. And what Mr. Peralta did not know was that the man Flaco had connected him with was a confidential informant, getting benefits in exchange for arranging set-ups for the DEA.

Over several conversations, Mr. Peralta agreed to provide the CI 60,000 methamphetamine pills. Mr. Peralta boasted and postured for the CI, claiming he could procure thousands of meth pills and other drugs. But when the time came for the deal to go down in September 2023, Mr. Peralta and his co-defendant, Pablo Hernandez Rodriguez, showed up empty handed.

What happened next was almost comical in its ineptitude. While Hernandez waited in the car that he and Mr. Peralta had rented that morning, Mr. Peralta got into the CI's car with just a couple of pills he claimed were a "sample." He spent the next two hours stalling, claiming the original supplier had fallen through and hoping the CI would give him the money on a promise that the drugs would eventually be delivered. The CI balked at such an absurd suggestion, and when Mr. Peralta could stall no longer, he told the CI he would be back and returned to the rented car with Hernandez. The pair agreed to find drugs to sell to the undercover and pulled away, and for nearly two hours they drove around the city while Hernandez frantically made calls hoping to find a drug connection.

At around 6:30 p.m., Mr. Peralta called the CI back and told him the drugs were on their way. The agents, meanwhile, had relocated the CI out of fear that what was going down was an attempted robbery, not a drug deal. Mr. Peralta and Hernandez finally returned to location for the deal, and a few minutes later co-defendant Kevin Amaya pulled up and delivered a backpack full of pills to Mr. Peralta and Hernandez. Having agreed with Hernandez to sell the pills, Mr. Peralta called the CI to say he had the drugs, and the agents descended and arrested all three people involved. In a tearful statement later that night, Mr. Peralta admitted what he had done.

Although the pills Amaya delivered weighed a lot – approximately eight kilograms – they were heavily stepped on, impure, and barely qualified as methamphetamine. Almost all the methamphetamine trafficked in this country is over 96% pure; "impure" meth typically has a purity level in the 80s. *See* U.S. Sent'g Comm'n, *Methampethamine Trafficking Offenses in the Federal Criminal Justice System*, at 32-33 (June 2024). The pills that Amaya gave Mr. Peralta were a little over 3% pure, and in its initial reports the DEA agents labeled the pills "fake methamphetamine." USAO_000017.

The arrest was devastating to Mr. Peralta and his family. His mother, well into her nineties, became inconsolable and now "cries almost every day, thinking about the conditions [Mr. Peralta] is living in at prison and not being able to see her son or talk to him." Ex. D (Letter from Jose Manuel Peralta). Mr. Peralta's grandchildren "miss their grandfather and are always asking about when he will come back home to see them." *Id.* And although it has been difficult for Mr. Peralta to maintain contact with them giving the well-documented communication problems at the MDC, his entire family stands ready to help him land on his feet when he returns to the Dominican Republic. *Id.*

**C. Mr. Peralta's horrific experience while at the MDC, and his sincere remorse.**

Mr. Peralta has been incarcerated at MDC Brooklyn for fourteen months. During that time, he has suffered from a severe hernia and back pain that has left him nearly unable to walk. MDC medical staff, however, have insisted that his condition can be adequately treated with ibuprofen, and

refused to provide that medication because of a BOP policy requiring over-the-counter medications to be bought from commissary funds. Despite Mr. Peralta's limited means and defense counsel's attempts to intervene, MDC Legal has insisted that Mr. Peralta has sufficient funds to pay for that medication. MDC medical staff, meanwhile, x-rayed Mr. Peralta's back over a year ago and discovered that he had a degenerative disc disease and spinal compression. Yet the medical staff never bothered to tell him his diagnoses, much less prepare a treatment plan. He did not learn of his diagnoses until I reviewed his medical records with him in preparation for sentencing.

Meanwhile, Mr. Peralta has been cut off from his family, as phone calls from the MDC to the Dominican Republic are both unreliable and unreasonably expensive. He has spent most of his fourteen months locked down in a tiny cell for nearly the entire day, let out only for the occasional shower. He has been fed rotten, weevil-infested food. He has witnessed daily violence, and two people have been murdered at the MDC this year. Just last week, inmates had their water cut off, and were given one bottle of water for the day to serve as both hydration and a portable toilet. Despite the inhumane conditions, he has not had any infractions.

The only person Mr. Peralta has been able to speak with consistently is Silvia. During his calls he has been extremely remorseful. As Silvia explains, "He tells me he will never do something like this ever again, and that every day he spends at MDC fills him with more regret. His situation saddens me, but his remorse is why I have continued to support him, because I know he is sorry and genuinely means it." Ex. D. Mr. Peralta has written to the Court expressing his remorse and regret, in a letter dictated orally due to his still being illiterate at 52 years old. Ex C.

On July 16, 2024, Mr. Peralta pled guilty to conspiring to violate 21 U.S.C. § 841(b)(1)(B). In its plea agreement, the government did not claim that Mr. Peralta was an organizer, leader, manager, or supervisor of drug trafficking activity. Mr. Peralta apologized and expressed remorse for his

actions, admitting that he agreed with another person to sell methamphetamine. As he conveys to the Court in his letter, Mr. Peralta's one hope is that he can see his mother again before she dies. Ex. C.

**D.  <u>The Probation Department recommends a substantial downward variance.</u>**

In its pre-sentence report, the Probation Department calculated Mr. Peralta's offense level as 31 and criminal history category as III, resulting in an advisory guidelines range of 135 to 168 months' imprisonment, with a statutory mandatory minimum term of sixty months' imprisonment. PSR at 26.[2] Probation noted, however, that there were several mitigating factors present: Mr. Peralta's "difficult childhood and upbringing," need to start working when he was just seven years old, and lack of a "formal education." *Id.* at 27. Probation added that Mr. Peralta's "difficult upbringing, familial circumstance and status as a nonviolent offender may be variance factors to consider." *Id.* ¶ 99.

Probation ultimately recommended a downward variance and a 96-month sentence. *Id.* at 26.

**III.    <u>THE APPROPRIATE SENTENCE IS SIXTY MONTHS' IMPRISONMENT</u>**

Although the Court must consider the advisory guidelines sentencing range, the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (citations omitted). "Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant." *Id.* at 182. Rather, the Court must conduct an "independent review of the § 3553(a) sentencing factors." *Id.*

Under 18 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing. Since courts must "consider every convicted person as an individual," the sentence imposed must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted). As such, the Court

---

[2] In the plea agreement, the parties stipulated to a criminal history category of II and a guidelines range of 121 to 151 months. The increased criminal history category is based on Mr. Peralta's previous illegal reentry conviction. Upon review, that case does appear in the criminal history the government provided to the defense at presentment and as part of its discovery production. The defense does not object to Probation's guidelines calculation.

must evaluate factors including, among other things, the "nature and circumstances of the offense and the history and characteristics of the defendant"; "the need to avoid unwarranted sentencing disparities"; and the need for the sentence to provide just punishment, afford adequate deterrence, and protect the public.  18 U.S.C. § 3553(a)(1)-(7).

Here, considering the well-documented deficiencies in the drug guidelines, a sentence anywhere near the artificially inflated guidelines range would be far greater than necessary.  Rather, the § 3553(a) factors weigh heavily in favor of the statutory minimum sentence given Mr. Peralta's heartbreaking background, lack of education, health problems, family support, and the circumstances of this bungled drug deal to an undercover – a deal involving some of the least pure methamphetamine imaginable.  A sentence of sixty months – the average sentence for similarly situated defendants in this District – would be sufficient but not greater than necessary.

A. **The drug guidelines – which judges have repeatedly criticized as illogical, politically driven, and not based on empirical evidence, and which judges on the Sentencing Commission have rejected on policy grounds – do not deserve any deference.**

Although the guidelines are the "starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007), they are but one of seven statutory sentencing factors.  18 U.S.C. § 3553(a)(1)-(7).  The Court has broad authority to vary downward and impose a sentence below the advisory range, including "based on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."  *Dorvee*, 616 F.3d at 188 (citations omitted).

Few guidelines have come under more withering criticism, and generated more policy disagreement, than U.S.S.G. § 2D1.1, the drug trafficking guideline.  That guideline was developed in an unempirical fashion, inexplicably utilizes weight as a proxy for culpability, and does not reflect the "heartland" of drug cases.  In fact, two judges who currently sit on the Sentencing Commission – Judges Carlton Reeves (the Chair) and John Gleeson – have rejected § 2D1.1 on policy grounds.  *United*

*States v. Robinson*, 2022 WL 17904534 (S.D. Miss. 2022) (unreported) (Reeves, J.); *United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. 2013) (unreported) (Gleeson, J.).

As the Supreme Court has recognized, the drug trafficking guideline is largely the result of political considerations rather than empirical realities.  Through the Sentencing Reform Act of 1984 (the "SRA"), Congress created the U.S. Sentencing Commission.  The Commission was meant to fill "an important institutional role: it has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise."  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).  By utilizing its expertise and empirical data, the Commission would, under the SRA's formulation, be able to produce guidelines that "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Id.*  For most offenses, "the Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices."  *Id.* at 96.

The Commission, however, "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."  *Id.*  Instead, it adopted a "weight-driven scheme" keyed to the weight-based mandatory minimum sentences Congress enacted in the Anti-Drug Abuse Act of 1986 (the "ADAA").  *Id.*  Essentially, the Commission took the weight-based mandatory minimums and then set guidelines ranges in proportion to those minimums.  The result was a "drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses."  *Id.* "[E]mpirical data on drug trafficking offenses were gathered, but they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses."  *Diaz*, 2013 WL 322243, at *4 (emphasis in original).  By linking the guidelines ranges to weight rather than role in the offense, the Commission thus created an unempirical system where "the vast majority of federal drug offenders who are neither managers nor leaders are subjected to the harsh sentencing scheme that Congress intended only for

those who occupy such roles." *Id.* *6. This was so even though the mandatory minimums in the ADAA were passed specifically to target managers or leaders of large-scale drug enterprises. *Id.*

Meanwhile, over the ensuing decades, the Commission has repeatedly amended § 2D1.1 – particularly with regard to methamphetamine – to be *harsher*. And it has done so based not on empirical data, but on Congress's political directives. For instance, the initial drug quantity table in § 2D1.1 did not include methamphetamine, since Congress had not set mandatory minimums for that drug in the ADAA. The Commission instead assigned a "drug equivalency" value for meth. *See* U.S. Sent'g Comm'n, *Methamphetamine: Final Report of the Working Group*, at 7-8 (1999). In 1988, however, Congress added mandatory minimum penalties for meth. The Commission responded by "incorporating these statutory penalties into the drug trafficking guideline," make the meth penalties much harsher based purely on Congress's political decisions rather than new empirical data. U.S. Sent'g Comm'n, *Methamphetamine Final Report*, at 8 (Nov. 1999). Then, in the late 1990s, the Commission made the meth guidelines harsher still by cutting in half the amount of meth corresponding to each offense level. This change was instituted because Congress directed the Commission to amend the guidelines "to provide for increased penalties" for meth – again, a purely political change. U.S.S.G. App. C, Amend. 555 (Nov. 1, 1997). Although the Commission claimed its ultimate meth guideline resulted from careful analysis and study, it was noted at the time that there was no indication "the Commission has conducted any studies, held any hearing or otherwise deliberately considered whether the current methamphetamine guidelines" were insufficient. National Assoc. of Criminal Defense Lawyers, Comments on the 1997 Amendments – Part II, at 6 (Mar. 28, 1997), https://www.nacdl.org/Document/Comments-USSC-1997Amend-03281997. Indeed, the Commission conceded that it would continue to link the drug quantity table to Congressionally-set mandatory minimums because doing otherwise "may prove politically unwise." U.S. Sent'g Comm'n, *Methamphetamine Final Report*, at 18 (Nov. 1999).

The result of the Commission's abandonment of its typical empirical approach has resulted in a situation where "Guideline ranges of imprisonment for [drug trafficking] crimes are a less reliable appraisal of a fair sentence" than most other offenses. *United States v. Goodman*, 556 F.Supp.2d 1002, 1010 (D. Neb. 2008). This is particularly so because, as many courts have recognized, weight – the main driver of the guidelines range in a drug case – is a terrible proxy for culpability. As one district court explained in discussing the myriad problems with the methamphetamine guideline:

> The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important fact in the court's assessment of a defendant's ultimate culpability.

*United States v. Hubel*, 625 F.Supp.2d 845, 853 (D. Neb. 2008). Put differently, the drug guideline is flawed because of its "overemphasis on quantity and the under emphasis on role in the offense." *United States v. Cabrera*, 567 F.Supp.2d 271, 275 (D. Mass. 2008) (Gertner, J.).

The drug trafficking guideline has thus created a system that "subjects all defendants to harsh treatment, not just the managers and leaders of the drug enterprise." *United States v. Hayes*, 948 F.Supp.2d 1009, 1028 (N.D. Iowa 2013). The Commission has noted that "for every function, the quantity of drugs involved in the offense resulted in a base offense level that included or exceeded the five-year mandatory minimum penalty," even though Congress's mandatory minimums were meant to target large-scale drug traffickers, and even though the Commission's own research demonstrates that "the quantity of drugs involved in an offense was not closely related to the offender's function in the offense." U.S. Sent'g Comm'n, *Report to Congress: Mandatory Minimum Penalties in the Criminal Justice System* at ii (2011).

This flaw has led commissioners like Judge Gleeson to call for de-linking § 2D1.1 from Congress's "weight-driven mandatory minimum sentences." As Judge Gleeson explained in rejecting

§ 2D1.1 on policy grounds, the drug guideline is "not based on empirical data and national experience," is "excessively severe" because it exposes all participants in a drug deal to the ranges Congress intended for "managers and leaders of drug organizations," and is "driven by drug type and quantity, which are poor proxies for culpability." *Diaz*, 2013 WL 322243 at *1-2. Judge Gleeson added that, in § 2D1.1, the Commission abandoned its stated goal of establishing a scheme reflecting sentences in the "heartland" of particular cases. *Id.* at *9. As a result, "sentences *below* the Guidelines range remain the rule rather than the exception for drug trafficking offenses." *Id.* (emphasis added)

The flaws in § 2D1.1 are particularly severe when it comes to methamphetamine. As federal district judges have noted, the "methamphetamine Guidelines are fundamentally flawed because they fail to consider additional factors beyond quantity. The system is too severe in the indiscriminate way it treats offenders." *Hayes*, 948 F.Supp.2d at 1029. The meth guideline is, moreover, "overinclusive, because it subjects all defendants to harsh treatment, not just the managers and leaders of the drug enterprise." *Id.* at 1028. It thus results in sentences that do not effectuate the Commission's goals: "sentencing data over the years reveal that the Guidelines range for methamphetamine offenses do not constitute the typical case or heartland." *Id.* at 1030. In fact, just two years ago Judge Carlton Reeves – the Chair of the Sentencing Commission – rejected the meth guideline on policy grounds, given its undue focus on purity and weight rather than "all of the circumstances of the defendant's case and life." *Robinson*, 2022 WL 17904534 at *3.

Mr. Peralta's case exemplifies the empirical flaws and draconian outcomes inherent in the meth guideline. Based on the drug quantity table, Mr. Peralta's advisory guidelines range is 135 to 168 months in prison – between eleven and fourteen years. Yet this case involved one bungled drug deal for which he was not an organizer, leader, or supervisor. Mr. Peralta was not a major drug trafficker: he did not even *have* the drugs he agreed to sell when he showed up for the deal, and he and his co-defendant had to leave after the CI refused to simply hand over payment, driving around aimlessly for

nearly two hours until they tracked down someone who could supply them. The deal was confined to a CI, and no drugs made it into the community. Yet because of the unempirical approach taken by the Commission, Mr. Peralta stands to be sentenced as heavily as a major drug trafficker.

And the drugs co-defendant Amaya ultimately gave Mr. Peralta to resell were only a little over 3% pure. The Commission has recognized that since "controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1, App. Note 27(c). Yet "most methamphetamine confiscated today is 'pure' regardless of whether the defendant is a kingpin or a low-level addict." *Robinson*, 2022 WL 17904534, at *3. Indeed, the median purity of methamphetamine in non-border districts in 2022 was 98%. U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System*, at 35 (June 2024). Because of the stunningly high purity of methamphetamine typically sold in this country, courts have repeatedly criticized the logic that possessing highly pure meth evinces a high role in a drug operation, since even street level dealers almost always possess meth that is highly pure. *See, e.g., Robinson*, 2022 WL 17904534, at *3. Obviously, however, possessing pills that are so *impure* they barely constitute meth shows how *low* in the chain of drug distribution Mr. Peralta was, when even the lowliest street dealer's meth is thirty times purer.

In sum, the drug guidelines in general – and the meth guideline in particular – are shockingly flawed, and district courts have repeatedly rejected them on policy grounds. On the facts of Mr. Peralta's case, the Court should give § 2D1.1 "very little weight." *Diaz*, 2013 WL 32243, at *18; s*ee*, *Robinson*, 2022 WL 17904534, at *3.

**B. The § 3553(a) factors support a 60-month sentence.**

As noted, the advisory guidelines range here – 135 to 168 months – is the result of such a flawed guideline that it provides this Court little empirical guidance as to what an appropriate sentence

should be. The only limitation on the Court's sentence is the sixty-month mandatory minimum. In light of the § 3553(a) factors, a sixty-month sentence for Mr. Peralta – whose only previous jail sentence was just a few months long – would be sufficient but not greater than necessary.

Initially, Mr. Peralta's history and characteristics support a sentence at the mandatory minimum. 18 U.S.C. § 3553(a)(1). Mr. Peralta has endured a uniquely challenging life. He was raised in desperate poverty in the Dominican countryside. Beginning when he was just seven years old, he was forced to work in the cane and tomato fields, suffering harsh conditions, exploitation, and violence that has left him scarred to this day. He lacked almost every opportunity imaginable: he had neither indoor plumbing nor electricity, never had even the semblance of a childhood, grew up surrounded by violence, and received no education. He is now a 52-year-old man who cannot read or write.

Mr. Peralta's obstacles continued throughout adulthood. He carried the financial burden of keeping his family above water: he was responsible for his elderly mother's medical expenses; he had five children to feed and support; and at one point he emptied his life savings to fund an operation that saved his sister's leg. His menial wages failed to make ends meet, yet he worked tirelessly in jobs like construction worker, taxi driver, and bus ticket-taker, doing his best to earn a living despite his illiteracy. Mr. Peralta has shown a remarkable amount of self-sacrifice on behalf of his family throughout his life. That is one of the principal reasons his family stands ready to support him in any way they can once he returns home. Ex. D.

The government will doubtless emphasize Mr. Peralta's criminal record and his immigration status. And there can be no doubt that Mr. Peralta should not have returned to the United States following his deportation – something that, following the horrific experience he has endured over the last fourteen months, he will certainly never do again. Although his record is not immaculate, his only

prior convictions were for a drug possession case in Rhode Island and an illegal reentry conviction.[3] He has never been convicted of a violent crime, never possessed a weapon, and prior to this case had only ever spent a few months in jail. Sentencing someone with that background and limited record to 135 months' imprisonment would be far greater than necessary.

And Mr. Peralta has shown since remorse for his actions in this case. He accepted responsibility immediately, admitting to the agents what he had done just a couple of hours after his arrest. He pled guilty and apologized for his poor decision. As he states in his letter to the Court, his goal is to get home before his mother dies, settle back in the Dominican Republic, find gainful employment, and return to the law-abiding life he led there before this incident:

> I will be living with my mother and my family in Bani, where they are anxiously waiting for me to return. I will work in construction because it's what I know best. My sons and grandchildren miss me dearly and are frustrated, and my grandchildren don't understand where I am and why I haven't seen them for so long. I am a family man and my love and respect for my family in the Dominican Republic will keep me from returning to the U.S. There is nothing left for me here, and I am genuinely sorry for my actions.

Ex. C.

Moreover, a sixty-month sentence is appropriate considering the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Mr. Peralta's actions were serious, and he has never minimized their gravity in any way. But by the standards typically seen in this District, the conduct here warrants a sentence not greater than the very high, five-year mandatory minimum. This was a botched drug deal to a confidential informant. Mr. Peralta was not an organizer or leader, did not use weapons or violence, and did not sell to civilians. And the very way the situation played out demonstrates that Mr. Peralta, for all his big talk with the CI, was not a major drug trafficker. He showed up to the deal with no drugs, hoping the CI would simply hand him thousands of dollars and trust him to bring the

---

[3] Mr. Peralta was charged with drug possession in Massachusetts, but he was deported before that case resolved. He maintains the presumption of innocence as to that charge.

pills later.  No reputable drug trafficker would propose something so ridiculous; it was the kind of

suggestion that, in the real world of drug trafficking, could easily have gotten Mr. Peralta killed.  Mr.

Peralta had to drive around with his co-defendant for nearly two hours trying to locate something to

give the CI when it became clear their original proposal was not going to be accepted.  The whole

situation was so unbelievably absurd that the agents moved the CI off the scene, fearing this might

actually be an attempted robbery.  USAO_000029.  Walter White, Mr. Peralta was not.

    True, this case involved a lot of pills.  Yet as Judge Gleeson, now on the Sentencing

Commission, explained in decrying the "broken" drug guideline:

> A more useful factor in determining culpability is not quantity, but role.
> The managers and leaders of a drug organization actively plan the
> organization's activities, plot to increase its profits, and recruit its
> members.  As a result, they are more likely to initiate crimes related to
> their drug enterprise and will be driven to increase the scale of those
> crimes.  They are also more likely to commit new crimes in the future.
> By contrast, a low-level dealer or courier is easily replaceable and does
> little to advance the goals of the overall drug organization.  He or she
> may be driven to crime by poverty or addiction, problems that can be
> addressed without incarceration.  He or she will be less likely to
> recidivate in the future; if a term of incarceration is imposed, "a short
> prison sentence is just as likely to deter them from future offending as
> a long prison sentence."  Rational sentencing policies will favor
> lengthier sentences for managers and leaders than for low-level
> workers because of their respective roles, not because of the quantities
> of drugs that happen to be involved in their offenses.

*Diaz*, 2013 WL 322243, at *13.  Mr. Peralta was precisely such a low-level dealer, driven by poverty,

and lacking the very drugs he promised to sell.  He was in way over his head.  Sentencing Mr. Peralta

to the kinds of sentences Congress intended to be imposed on drug traffickers would be draconian.

    And it cannot be overemphasized that the meth in this case barely qualified as such.  The pills

in this case – a little over 3% pure – must be some of the least pure meth ever sold in this country.

Two-thirds of meth trafficked nationally is over 96% pure; over 90% of the meth in this country is

over 80% pure.  Meanwhile, less than 2% of the meth in this country is less than 48% pure, the lowest

range the Commission has even bothered to track.  U.S. Sent'g Comm'n, *Methamphetamine Trafficking*

*Offenses in the Federal Criminal Justice System*, at 33 (June 2024). So even if the weight of the pills Mr. Peralta briefly possessed were a relevant consideration for this Court, the fact that those drugs were among the least pure meth ever distributed in this country certainly matters.

The government will likely refer to the pills here, as it did at the presentment, as "dangerous." And certainly, methamphetamine is a dangerous drug. It must be noted, however, that methamphetamine is far less dangerous than drugs that are sentenced far less severely. *See Hayes*, 948 F.Supp.2d at 1026 ("[M]any drug abuse experts contend that methamphetamine is not the most harmful drug"); *see also United States v. Bean*, 317 F.Supp.3d 46, 54 (D.N.H. 2019) (criticizing harsher treatment of methamphetamine under the guidelines than drugs like crack and heroin, which is "unsupported by empirical data"). It results in much fewer overdose deaths than opioids. *See* Nat'l Inst. On Drug Abuse, *Drug Overdose Deaths: Facts and Figures*, at Fig. 2 (Aug. 2024), https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Fig2. And while potency is not directly correlated to purity, it is almost never the case that meth is *more* potent than it is pure. U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System*, at 9 (June 2024). Given that fact, it is hard to imagine that the meth Mr. Peralta possessed – barely more than 3% pure – was anywhere near as strong as the 97%-potent meth typically sold on the streets. *Id.*

Finally, a sixty-month sentence would satisfy the statutory purposes of punishment. First, from a retributive perspective, 18 U.S.C. § 3553(a)(2)(A), five years in federal prison for a 52-year-old man with Mr. Peralta's background, who committed a crime of this type, who has never served more than a few months in jail before, who hurt no one, and who has been remarkably remorseful, would "promote respect for the law" and "reflect the seriousness of the offense." *Id.*

In this respect, it must be noted that Mr. Peralta has spent fourteen months in pretrial detention at MDC Brooklyn, quite possibly the most dysfunctional and dangerous jail in the United States. His time at the MDC has been harder and more punitive than that of inmates in pretrial

detention elsewhere, and more severe than what Congress or the Sentencing Commission had in mind when the guidelines were promulgated.

As Judge Furman noted earlier this year in a widely cited decision, "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put a fight, let alone dispute that the state of affairs is simply unacceptable." *United States v. Chavez*, 22-Cr-303, ECF No. 31, at *2-3 (S.D.N.Y. Jan. 4, 2024). Judge Furman noted the "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the last three years." *Id.* at *1-2.

Judge Furman went on to discuss the three most prominent issues at the MDC. "First, inmates at the MDC spend an inordinate amount of time on 'lockdown' – that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at *9. Next, "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates – especially where such care requires the attention of outside providers." *Id.* at *10-11. And finally, "the MDC's physical conditions have long been problematic," including "visible mold, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Id.* at *12. Mr. Peralta has experienced all the deprivations Judge Furman expounded upon in *Chavez*.

Incredibly, things have gotten worse since *Chavez*, during the time period in which Mr. Peralta has been incarcerated at the MDC. For instance, the period from March to August of 2024:

> [W]as marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words. The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries:

> drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as-yet-unidentified "brawls."

*United States v. Colucci*, 2024 WL 3643857, at *5 (E.D.N.Y. Aug. 5, 2024).  As a result, the facility has been on near constant lockdown, with social and even legal visits sharply curtailed.

In June, an article was published in which the media spoke with inmates at the MDC, who described stabbings, weapons, lockdowns, criminal misconduct by corrections officers, cockroaches in the food, and terrible medical care.  Video evidence was provided.  *See* Courtney Gross, *Inmates Decry Conditions in Brooklyn Jail*, NY1 (June 24, 2024), available at https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions.  Judge Gary Brown recently referred to the conditions at the MDC as "dangerous" and "barbaric," and noted that he would vacate a defendant's short sentence and convert it to home detention if the BOP designated him there.  *Colucci*, 2024 WL 3643857, at *7.  Judge Brown's decision cited countless examples of the horrific conditions at the MDC, and cases in which judges granted relief in the form of sentence reductions based on those conditions.  As Judge Brown explained, "sentencing arguments based on the reportedly deplorable conditions at MDC have grown so commonplace that – quite understandably – counsel routinely raise the issue in shorthand fashion, as lawyers and judges have grown weary of extended articulation." *Id.* at *6.

Put frankly, the fourteen months Mr. Peralta has spent at the MDC have been fundamentally different than six months spent in pretrial detention by the typical federal defendant.  In addition to witnessing and experiencing all of the horrors described in *Chavez* and *Colucci*, Mr. Peralta has spent fourteen months enduring agonizing pain from a hernia and spinal disorder.  The MDC has insisted that those conditions can be treated with ibuprofen, meaning requesting a medical order would have had no meaningful impact – and the MDC typically ignores such orders anyway.  It then insisted that BOP policy required Mr. Peralta to pay for that medication out of his commissary, a callous demand

considering his financial situation. The MDC medical staff did not even bother to tell Mr. Peralta about the spinal disorders it had discovered when it x-rayed him last year. The months Mr. Peralta has endured at the MDC have simply been more punitive than months spent anywhere else, and the Court should take the MDC conditions into account when imposing sentence.

Making matters worse, Mr. Peralta's sentence will not even end when his term of incarceration runs out. He will face months in immigration detention after he is released from federal prison, none of which will be credited by the BOP. Meanwhile, because of his non-citizen status, his access to programming while incarcerated will be sharply curtailed, and his ability to communicate with his loved ones in the Dominican Republic will be almost non-existent. He will receive no visits, and will continue as isolated as he has been for the last fourteen months. More than sixty months under such conditions would be unduly punitive.

Second, from an incapacitation and deterrence perspective, a sixty-month sentence would be sufficient. In term of specific deterrence, the Sentencing Commission acknowledges that "the age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age." U.S.S.G. § 5H1.1, p.s. Mr. Peralta presents a very low risk of recidivism: by the time he is released on a sixty-month sentence he will be 57 years old, and only 26.8% of offenders in that age range are ever rearrested. U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 22 (Dec. 2017). The numbers are even lower for methamphetamine offenders between fifty and 59 years old, who only recidivate 25.6% of the time. U.S. Sent'g Comm'n, *Recidivism of Federal Drug Trafficking Offenders Released in 2010*, at 110 (Jan. 2022). Meanwhile, by the time of his release, Mr. Peralta will have aged more drastically than he would have on the outside: incarcerated people "face more chronic and life-threatening illnesses earlier than we would expect outside of prison, and physiological signs of aging occur in people younger than expected." *See* Emily Widra, *The Aging Prison Population: Causes, Costs, and Consequences*, Prison Policy Initiative (Aug. 2, 2023),

21

https://www.prisonpolicy.org/blog/2023/08/02/aging/#:~:text=A%20robust%20body%20of%20research,in%20people%20younger%20than%20expected.  There is simply no reason to believe a sentence greater than sixty months will have a stronger specific deterrent effect for Mr. Peralta, who has experienced medieval pre-trial incarceration conditions that have taught him a lesson, and who was not a leader or manager in the offense.  *See Diaz*, 2013 WL 322243, at *13 (for non-leaders in drug trafficking cases, "a short prison sentence is just as likely to deter them from future offending as a long prison sentence").

Nor is a sentence greater than sixty months necessary to achieve general deterrence.  It is well-settled that "the vast majority of people who are committing crime are not particularly forward-looking," and "social science conclusively finds that certainty matters more than severity" in the deterrence context – that is, people are deterred based on their likelihood of being caught, not on the length of the sentence they may receive.  Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021),                    https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/?sh=6f8975277bd4 (hereinafter "Jacobs Report").  In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."  U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.  "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."  *Id.*  Put differently, longer sentences do not have a stronger deterrent effect simply by virtue of being longer.

This is particularly true in the drug context: because drug offenses are driven by user demand, incarcerating low-skilled drug sellers who are easily replaced in the market does little to combat drug availability.  Indeed, as the punishments have increased steadily since 2000 for methamphetamine, the

supply and consumption of that drug has increased unabated, showing that lengthier sentences do not result in general deterrence. Meanwhile, in methamphetamine cases, there is practically no difference in recidivism rates between individuals who receive two-year sentences, five-year sentences, and sentences greater than ten years. U.S. Sent'g Comm'n, *Recidivism of Federal Drug Trafficking Offenders Released in 2010*, at 113 (Jan. 2022). The idea that warehousing low-skilled individuals like Mr. Peralta has an effect on the market for illegal drugs is pure legal fiction, and does not support a sentence of more than five years in a federal prison.

And fourth, incarceration for greater than five years will not improve Mr. Peralta's access to medical care or programming. His ability to access programming will be sharply curtailed due to his immigration status; in any event, he will not have better access to programming six years from now than he will over the next five years. And the BOP's medical care is atrocious, as evidenced by the way Mr. Peralta has been treated over the last fourteen months at the MDC.

Mr. Peralta is a man who has endured difficult challenges and made a terrible mistake. He will pay for that mistake with the next five years of his life. His only hope is to return home and see his mother, who is in her nineties, before she dies; to reunite with his family; and to never return to this country again. Locking him away into his sixties for a non-violent, botched drug sale to a CI would be draconian. A sixty-month sentence is enough; no purpose is served by imprisoning Mr. Peralta for longer than that. A sentence at the mandatory minimum would, therefore, be sufficient and not greater than necessary.

### C. A sentence greater than sixty months would result in unwarranted sentencing disparities with similarly situated defendants.

In the Southern District of New York, the vast majority of defendants receive sentences below the advisory guidelines range, particularly following guilty pleas. Over the last nine fiscal years, nearly 77% of defendants in this District were sentenced below the guidelines range, receiving either

downward variances, departures, or 5K letters.  Just last year, nearly 80% of defendants in this District received below-guidelines sentences.  Ex. A.

The prevalence of below-guidelines sentences is even more pronounced for individuals similarly situated to Mr. Peralta.  Last year, for instance, over 90% of defendants sentenced for drug trafficking in this District received below-guidelines sentences.  U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2023, Southern District of New York*, at 16.  For methamphetamine cases in particular, since 2015, of the fifteen defendants similarly situated to Mr. Peralta in this District – non-career offenders in criminal history category III – *fourteen* received below-guidelines sentences.  Ex. B.

And similarly situated defendants do not just receive below-guidelines sentences – they are typically sentenced to about sixty months in prison.  Last year in this District, the average sentence for drug trafficking was 64 months, and the median sentence was 48 months.  U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2023, Southern District of New York*, at 11.  Individuals similarly situated to Mr. Peralta – in criminal history category III, not career offenders, and convicted of trafficking methamphetamine – have fared no differently.  Over the last five fiscal years, the average sentence for such similarly situated defendants has been 61 months in this District, with a median sentence of 60 months.



*See* U.S. Sent'g Comm'n, *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard.

All told, the sentence Mr. Peralta requests – sixty months' imprisonment – would be directly on par with the average sentence similarly situated defendants receive in this District.  And that is to say nothing of his unique mitigating circumstances, his lack of a leadership role, or the staggeringly low purity level of the pills involved in this case.  A higher sentence – and certainly the 96-month sentence Probation suggests or the 135-month advisory guidelines sentence – would create an unfair disparity with the way other similar individuals are treated.

## IV.    <u>CONCLUSION</u>

Santo Peralta Lara made a terrible mistake, for which he will pay with at least five years of his life.  He hurt no one but himself with this bungled transaction.  He understands how wrong his conduct was, and he has not tried to minimize his actions.  He asks only for the sentence similarly situated individuals typically receive in this District.  Given his background, the nature and circumstance of the offense, and his strong family support, a sixty-month sentence would be sufficient but not greater than necessary.

Dated:   November 7, 2024                             Respectfully submitted,
          New York, New York

                                                      _____/s/_____

                                                      Michael Arthus, Esq.
                                                      Federal Defenders of New York
                                                      52 Duane Street, 10th Floor
                                                      New York, NY 10038
                                                      212-417-8760